IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

MARK ANTHONY WILKES,     )   CIVIL ACTION NO. 9:15-0540-JMC-BM
)
)
         Plaintiff,   )
)
v.          )   **REPORT AND RECOMMENDATION**
)
CAROLYN W. COLVIN,     )
Acting Commissioner of Social Security,  )
)
         Defendant.  )
_____)

      The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein he was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Civil

Rule 73.02(B)(2)(a)(D.S.C.).

      Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI")[1] on May 15, 2012, alleging disability beginning September 28, 2011, due to vertigo,

foot problems, vision problems, hearing problems, and a learning disability. (R.pp. 39, 111-112,

200, 207). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then

_____

      [1]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue,
No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot
establish that she was disabled during the insured period for DIB may still receive SSI benefits if she
can establish that she is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542,
2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005); see also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir.
1999)[Discussing the difference between DIB and SSI benefits].



requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 6, 2014. (R.pp. 37-80). The ALJ thereafter denied Plaintiff's claims in a decision issued August 7, 2014. (R.pp. 16-30). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-4).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed with an award of benefits, or alternatively reversed and remanded for further consideration. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Richardson v. Califano</u>, 574 F.2d 802, 803 (4th Cir. 1978); <u>Myers v. Califano</u>, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].



Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Discussion

A review of the record shows that Plaintiff, who was forty-five (45) years old at the time of the ALJ's decision, has a limited education and past relevant work experience as an assembly press operator, landscape laborer, and truck operator. (R.pp. 28, 45, 70, 200, 262). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of vertigo, intellectual disability,

---

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).



3

bilateral foot pes cavovarus,[3] right eye strabismus amblyopia,[4] and situational depression (R.p. 18), he nevertheless retained the residual functional capacity ("RFC") for a less than full range of light work.[5]  Specifically, the ALJ found that Plaintiff was restricted to standing and walking for a total of four hours and sitting for a total of six hours in an eight hour day; frequently using foot controls; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; frequently balancing, stooping, kneeling, crouching, and crawling; occasionally using far visual acuity in his right eye; avoiding all hazards associated with unprotected dangerous machinery or unprotected heights; and performing jobs where the use of a wide field of vision was limited to occasional or less. Plaintiff was further limited to jobs involving routine, repetitive tasks performed in a low-stress work environment free of fast-paced and team dependent production requirements, and involving only simple work-related decisions, and less-than occasional (if any) work place changes.  (R.pp. 20-21). Although the ALJ found that these limitations rendered Plaintiff unable to perform any of his past relevant work, he obtained testimony from a vocational expert ("VE") and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations, and was therefore not entitled to disability benefits.  (R.pp. 28-30).

---

[3]Pes cavovarus or talipes cavovarus is "a deformity of the foot in which the longitudinal arch is abnormally high and the heel is turned inward from the midline of the leg." Dorland's Illustrated Medical Dictionary, 1870 (32nd ed. 2012).

[4]Strabismic amblyopia is the "impairment of vision due to abnormal development" which results "from suppression of vision in one eye to avoid diplopia [double vision]." Id. at 57, 525.

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



Plaintiff asserts that in reaching this decision, the ALJ erred because he failed to properly evaluate the opinion of his treating physician, failed to find that his mental dysfunction met the requirements of Listings 12.02 and 12.05,[6] mischaracterized and misstated the record in significant respects, and failed to make a proper credibility finding. However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

## Medical Records

On April 21, 2008, Dr. Frank O. Pusey, Jr., of Columbia Neurological Associates, noted that Plaintiff had an incidental MRI abnormality and diagnosed Plaintiff with probable linear vertigo. Physical examination was otherwise normal, while mental status examination indicated that Plaintiff was alert and oriented with normal short-term memory, long-term memory, judgment, and concentration. (R.pp. 343-345).

On March 4, 2011 (approximately six months prior to Plaintiff's alleged date of onset), Plaintiff was examined by Dr. Michael Bernardo, a family practitioner with Family Healthcare Newberry, for complaints of dizziness that had begun approximately one week prior to the appointment. Plaintiff described a sensation of imbalance of moderate severity and requested

---

[6]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medial signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.



Meclizine (which had been prescribed for him in 2008 by Dr. Pusey - R.p. 344), as well as Lodrane. Plaintiff stated that his dizziness previously improved with Meclizine. Examination revealed intact cranial nerves, motor and sensory function, reflexes, gait, and coordination. (R.pp. 348-349). Plaintiff reported back to Dr. Bernardo on March 18, 2011, that he was only "a little dizzy now," and that his medications had helped his condition. (R.p. 351).

A functional capacity examination (which Plaintiff's employer arranged) was performed by Dr. Corey Hunt on September 27, 2011. Plaintiff told Dr. Hunt that he had been working for Kraft Foods for four years, but that his vertigo would sometimes get so bad that from time to time he had to leave work and go home early. Physical examination revealed that Plaintiff had a deviated gait to the left and right on tandem walking, which did not affect Plaintiff's ability to ambulate without assistance. Plaintiff was noted to have a normal appearance, normal tone and strength of muscles; intact sensation; normal reflexes; normal speech; negative Romberg's sign;[7] normal eye and ear examinations; and no ulnar drift. Plaintiff also had no atrophy, muscle weakness, asymmetry, or reduced range of motion, and he was able to sit comfortably on the examination table without difficulty or evidence of pain. Dr. Hunt opined that Plaintiff could lift and carry up to 50 pounds continuously and over 100 pounds occasionally (well above the lifting capacity for light work), push and pull occasionally, never climb, continuously operate food controls, work occasionally with moving machinery, never work at heights, continuously reach above his shoulder and grip, and occasionally rotate his head to the right and left. (R.pp. 356-358). Plaintiff's alleged disability onset date is the day after this examination.

---

[7]Romberg's sign is the "swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense, seen in tabes dorsalis and other diseases affecting the posterior columns." Dorland's at 1715.



Plaintiff subsequently returned to Dr. Bernardo and family practitioner Madelyn Serina at Family Healthcare Newberry on April 3, 2012 (the first time in over a year). Although this was now after Plaintiff alleges he had become disabled, Plaintiff reported that he was "a whole lot better," while a physical examination was normal including Plaintiff's gait and station. His coordination was intact. (R.pp. 361-363, 419-421).

On July 18, 2012, Dr. Pamela Carlton performed a psychological evaluation. (R.pp. 367-373). Plaintiff drove himself and his wife to the appointment. He stated that he and his family had been living with his in-laws (even though he had his own home) since February because they were helping care for his his father-in-law, who had had a stroke, and a grandmother who had Parkinson's disease. Plaintiff told Dr. Carlton he had a lazy right eye, hearing loss in both ears, and suffered from vertigo which limited his ability to stand. Plaintiff also related that he had a learning disability, had problems reading and handling paperwork, was in special education classes through his school years, and dropped out of school in tenth grade after getting into a fight. However, he denied any treatment for mental health problems, and said that his vertigo was the problem that limited his ability to work. (R.pp. 367-369).

Plaintiff stated, and his wife acknowledged, that he had no difficulty independently caring for his personal hygiene. His reported activities of daily living included going out to eat, playing with his children, caring for and feeding his chickens, and sometimes taking his children to the store. Plaintiff reported that he did not do "a whole lot of yard work," but was able to sweep or vacuum for a couple of hours, and said he could handle the cooking (although his wife and mother-in-law did the cooking). He also drove a car every day and had no difficulty driving; made trips to his home, to the store, and just around; and sometimes shopped for food or clothes (usually with his wife,



but said he was able to shop alone). On the weekends he relaxed and watched television, and he reported no difficulties getting along with supervisors or fellow workers when he worked and generally got along with people "pretty well." He also got along well with his family, but said he did not keep up with friends. Plaintiff stated he had problems making change, and that his wife had always handled the money. Plaintiff also reported that he could get distracted with what he was doing, but could usually come back to it, while his wife thought Plaintiff was able to concentrate unless he became frustrated with something. (R.pp. 369-370).

Dr. Carlton noted that Plaintiff had no abnormalities in psychomotor activity; his eye contact was good; his mood a little nervous; his affect was mood congruent; and his speech was logical, coherent, and goal directed with normal rate and rhythm. Dr. Carlton thought that overall Plaintiff's judgment and insight appeared to be good. (R.pp. 367-371). Although Dr. Carlton asked Plaintiff to let her know if he had problems seeing things during testing, he did not bring up any. She also noted that Plaintiff was able to understand directions and to follow them for all subtests except for the digit span sequencing subtest, while on the WAIS-IV, Plaintiff achieved a Full Scale IQ score of 57. Dr. Carlton opined that Plaintiff had mild-to-moderate difficulties handling the necessary activities of daily living completely independently, that he might have moderate difficulties with concentrating and persisting at a task, but had no noted limits in social functioning. Diagnoses included depressive disorder, not otherwise specified; mild mental retardation; vertigo; educational problems; poor literacy; and a Global Assessment of Functioning score of 55.[8] (R.pp. 371-373).

───────────────

[8] "Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF score between 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning." Am. Psychiatric Ass'n, Diagnostic & (continued...)



Dr. Carl Anderson, a state agency medical consultant, completed a physical residual functional capacity assessment based on review of the record on August 1, 2012, and opined that Plaintiff had no exertional limitations; could climb ramps/stairs occasionally; could never climb ladders, ropes, or scaffolds; had unlimited ability to balance, stoop, kneel, crouch, and crawl; needed to avoid even moderate exposure to hazards such as machinery and heights; and had no manipulative, visual, or communicative limitations. (R.pp. 90-92).

Psychologist Dr. Craig Horn, a state agency psychological consultant, completed a Psychiatric Review Technique form on August 1, 2012, in which he opined that Plaintiff had organic mental and affective disorders that did not meet listing level severity, as they resulted in only mild restrictions in his activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (each of extended duration). He noted that although Plaintiff reported problems adding and subtracting numbers, concentrating, and understanding, Dr. Carlson had found during her examination that Plaintiff was able to attend and focus well throughout the two-hour psychological evaluation and that Plaintiff had reported no problems getting along with supervisors or co-workers. Dr. Horn concluded that, overall, Plaintiff's mental impairments did not preclude him from performing simple, routine work. (R.pp. 88-89). Dr. Horn also completed a mental RFC assessment in which he opined that Plaintiff's mental impairments would not preclude Plaintiff from performing simple, repetitive work tasks; that he was able to understand and remember simple instructions, carry out short and simple instructions, and maintain concentration and attention for periods of at least two

[8](...continued)
Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).



hours; that he was able to respond appropriately to co-workers, supervisors, and the general public; and that Plaintiff was able to be aware of normal hazards and take appropriate precautions. (R.pp. 92-93).

Plaintiff underwent a consultative physical examination performed by Dr. John H. Ferguson on January 18, 2013. Plaintiff told Dr. Ferguson that he suffered from moderate to severe foot pain; moderate, intermittent vertigo; a lazy eye; and back pain (that had begun four months prior to the examination). Plaintiff also told Dr. Ferguson that he had a learning disability and did not read and write well. A physical examination revealed hammer toe deformity in all of Plaintiff's toes and high arches, ear examination was normal, and Plaintiff's muscle strength was 5/5 in both his upper and lower extremities. Visual acuity for near vision was 20/100 on the right and 20/40 on the left, and for distance vision was 20/70 on the right and 20/15 on the left. Reading comprehension, word comprehension, and writing were noted to be impaired. Dr. Ferguson diagnosed vertigo, constant, chronic and poorly and inadequately treated; strabismic amblyopia, right, chronic, most likely since childhood; acquired hammer toe, unspecified laterality; and low back pain. (R.pp. 377-384).

On January 28, 2013, state agency medical consultant Dr. Dale Van Slooten completed a physical RFC assessment based on review of the record and opined that Plaintiff had no exertional limitations; could occasionally climb ramps and stairs; could never climb ladders, ropes, and scaffolds; and should avoid even moderate exposure to hazards. (R.pp. 137-139). On January 28, 2013, Dr. Anna Williams, a state agency psychologist, completed a Psychiatric Review Technique form and a mental RFC assessment in which she reached the same conclusions as had state agency psychologist Dr. Horn (as noted above). (R.pp. 119-121, 124-125).

10



Plaintiff returned to Family Healthcare Newberry on May 2, 2013, at which time he complained to Dr. Bernardo and physician's assistant Madelyn Serina of chest pain he had been experiencing for the past three to four weeks. However, he denied being stressed or having chest pain at that time, and a physical examination was essentially normal, including normal cardiovascular findings, normal gait and station, and normal finger-to-nose and heel-to-shin tests for coordination. Active problems were noted to include dizziness and pes cavovarus. (R.p. 422-424). Thereafter, Plaintiff had physical examinations that were essentially normal on May 21 (at which time he was given a complete physical examination) and August 21, 2013 (at which time he was treated for cold symptoms), as well as on March 27, 2014 (as which time he was treated for heartburn/reflux). (R.pp. 425-438).

### Treating Physician Opinion

Plaintiff alleges that the ALJ erred in failing to properly address the opinion of his treating physician, Dr. Vincent S. Toussaint. In an undated handwritten statement, Dr. Toussaint opined that Plaintiff had "causes of disability" due to chronic vertigo and a developmental eye condition. (R.p. 326). Dr. Toussant stated that Plaintiff was being treated by a Dr. Thompson, an Ear, Nose, and Throat specialist;[9] that Plaintiff's vertigo occurred about once a day and lasted from five minutes to five hours; that Plaintiff's medication had unreliable results; that Plaintiff's vertigo attacks could be dangerous, making Plaintiff stagger; and that Plaintiff experienced hazardous episodes in the workplace. Dr. Toussaint also stated that Plaintiff was born with a developmental eye condition and a brain condition (which resulted in low IQ), and was in special education at school. (R.p. 326).

---

[9]The record contains no treatment notes from a Dr. Thompson.



11

Plaintiff asserts that Dr. Toussaint's opinion should have been given great weight because he is a treating physician with significant longitudinal experience with Plaintiff, his opinions are well supported by diagnostic and clinical evidence, and he is a medical expert. However, after considering Dr. Toussaint's medical source statement, the ALJ gave it little weight, specifically noting that there were no accompanying treating medical records from Dr. Toussaint, that it was unknown when this statement was even issued, nor were there any other examination reports included with this statement or cited to support Dr. Toussaint's opinion. The ALJ also discounted the statement because it appeared that, absent any records or examination reports, Dr. Toussaint was "merely reciting [Plaintiff's] reported history of his vertigo attacks." (R.p. 27). After a careful review of the record and decision, the undersigned can find no reversible error in the ALJ's treatment of Dr. Toussaint's opinion in this case.

Although the opinions of treating physicians are normally accorded significant weight, the ALJ's decision to give little weight to Dr. Toussaint's opinion is supported by the fact that there were no examination reports included with his statement, nor were there any treatment notes in the record. See Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]. Dr. Toussaint's statement was also not supported by the other evidence, including the records from other treating and examining physicians and records and opinions of the state agency medical sources. See Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996) [rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record]; Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]. The ALJ



specifically noted neurologist Dr. Pusey's 2008 diagnosis of probable linear vertigo and his normal

physical examination findings and mental status findings, (R.pp. 22, 344-345), and that Plaintiff did

not seek medical treatment for this condition again until he was seen by Dr. Bernardo in March 2011,

for complaints of dizziness that had begun approximately one week prior to the visit and which

improved with Meclizine. Plaintiff does not herself claim that she was disabled during this period

of time, and as noted by the ALJ, later physical examinations by Dr. Bernardo were normal and did

not indicate a worsening of his condition. (R.pp. 22-23, 26, 348-349, 362-363, 419-432). See Orrick

v Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition,

ability to work with impairment detracts from finding of disability]. The ALJ also gave partial weight

to the findings of Dr. Hunt in September 2011 (that Plaintiff could lift and carry up to 50 pounds

continuously; push and pull occasionally, never climb, continuously operate food controls, work

occasionally with moving machinery, never work at heights, continuously reach above his shoulder

and grip, and occasionally rotate his head to the right and left), but gave Plaintiff greater limitations

than found by Dr. Hunt because they were based on a one-time examination at the time of Plaintiff's

alleged onset of disability and did not provide a longitudinal history. (R.p. 27, 356-358). The ALJ

also cited to the findings of Dr. Ferguson from January 2013, who (while noting some deformities)

found that Plaintiff had generally normal muscle tone and 5/5 (full) strength. (R.pp. 25, 278-379).

See Gaskin v. Commissioner of Social Security, 280 Fed.Appx. 472, 477 (6th Cir. 2008)[Finding that

evidence of no muscle atrophy and that claimant "possesses normal strength" contradicted Plaintiff's

claims of disabling physical impairment].

   As noted, the ALJ also discounted Dr. Toussaint's statement because it appeared that

Dr. Toussaint was merely reciting Plaintiff's reported history of his vertigo attacks. An ALJ may



assign lesser weight to the opinion of a treating physician that was based largely upon the claimant's self-reported symptoms. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); see also Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) [ALJ properly rejected physician's opinion that was based on the claimant's own subjective complaints]. A physician's notation of a claimant's subjective complaints does not transform those subjective complaints into objective medical findings. See Craig v. Chater, 76 F.3d at 590 n. 2 [holding that a medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report]; see also Morris v. Barnhart, No. 03–1332, 2003 WL 22436040, at *4 (3d Cir. Oct.28, 2003) ["the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion."].

Plaintiff also argues that the ALJ erred by giving greater weight to the state agency physicians than the statement of Dr. Toussaint, and that the state agency physicians failed to properly consider "the existence and severity of the claimant's symptoms." However, these state agency physicians and psychologists are medical professionals who reviewed Plaintiff's medical history and subjective complaints in completing their RFC assessments. As such, the ALJ could properly consider these opinions in reaching his decision. See Johnson, 434 F.3d at 657 [ALJ can give significant weight to opinion of medical expert who has thoroughly reviewed the record]; Stanley v. Barnhart, 116 F. App'x 427, 429 (4th Cir. 2004)[disagreeing with argument that ALJ improperly gave more weight to RFC assessments of non-examining state agency physicians over those of examining physicians]; 20 C.F.R. § 404.1527(e); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) ["Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals



Council level of administrative review."].  Indeed, it is readily apparent that the ALJ gave Plaintiff

every benefit of the doubt by assigning only partial weight to the state agency opinions because they

did not adequately address Plaintiff's vertigo in regards to his exertional level.  (R.p. 27).  See

Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where

ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State

Agency examiner]; see also Siler v. Colvin, No. 11-303, 2014 WL 4160009 at * 5 (M.D.NC. Aug.

19, 2014) [Same]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24,

2009)[No error where ALJ gave Plaintiff even a more restrictive RFC than the medical records

provided].

    While Plaintiff  argues that the opinions of the state medical consultant should not

have been given greater weight than that of treating physician Dr. Toussaint because exhibits 9F and

10F (treatment records from Family Healthcare Newberry) were not part of the record at the time of

the opinion, part of those records, specifically the records from Plaintiff's April 2012 visit (R.pp. 361-

363, duplicated at 419-421), were part of the record before the state medical consultants (see R.pp.

87, 102), while the other records contained in exhibits 9F and 10F generally document only routine

care from Plaintiff's family physician and physician's assistant.  Further, as noted by the ALJ in his

decision, these records indicate that Plaintiff was treated at Family Healthcare of Newberry "for

normal maladies and medication management" and that Plaintiff "continued to attend regular follow

ups with generally normal examinations."  (R.p. 26).  Plaintiff fails to point out anything in these

records which would require the ALJ to obtain updated state agency consultant assessments as there

is nothing that undermines their earlier conclusions.



In sum, the ALJ properly considered and analyzed Dr. Toussaint's opinion in conjunction with the evidence as a whole, and the undersigned does not find that the ALJ failed to properly consider his opinion or the record and evidence in this case. Thomas v. Celebreeze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; Krogmeier, 294 F.3d at 1023 ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; Bowen, 482 U.S. at 146, n. 5 [Plaintiff has the burden to show that he has a disabling impairment]. Therefore, Plaintiff's argument that the decision in this case should be reversed due to an improper evaluation of Dr. Toussaint's opinion is without merit. Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]; see also Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

### Listings 12.02 and 12.05

Plaintiff also asserts that the ALJ erred in failing to find that his mental impairments met the Listings at 12.02 because he has a short-term memory impairment as shown by his inability to be trained to work in the HVAC vocation;[10] by his educational records; and by his testimony indicating that he has marked difficulties in maintaining concentration, persistence, or pace. Plaintiff argues that the medical evidence and his testimony show he has a history of chronic organic mental

---

[10]Plaintiff testified that he spent two to three months as a trainee at an HVAC job, but was unsuccessful in his attempt to learn the intricacies of this job. (R.p. 69).



disorder sufficient to meet this Listing.  The Commissioner contends, however, that Plaintiff failed

to carry his dual burdens of production and persuasion to prove his impairment met this Listing.  See

Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must

show that it meets *all* of the specified criteria.  An impairment that manifests only some of those

criteria, no matter how severely, does not qualify."].

   Listing 12.02 is met when paragraphs A and B are met, or when paragraph C is met.

Plaintiff argues that he meets Listing 12.02(C), which requires a claimant to show:

> Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities. The required level of severity for these disorders is met when the requirements in both A and B[11] are satisfied, or when the requirements in C are satisfied.
>       \* \* \*
> C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>    1. Repeated episodes of decompensation, each of extended duration; or
>    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

   In determining whether a claimant meets or medically equals a listed impairment, an

ALJ should "identif[y] the relevant listed impairments[,]" and then "compare[] each of the listed

---

[11]The ALJ also considered and found that Plaintiff did not meet or equal 12.02 (B), and Plaintiff does not appear to dispute this.  (R.p. 20).



criteria to the evidence of [the claimant's] symptoms." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ did so here, finding that Plaintiff did not meet or equal Listing 12.02(C) because Plaintiff did not have repeated episodes of decompensation, did not have a residual disease process that resulted in such marginal adjustment than even a minimal increase in mental demands or change in environment would be predicted to cause him to decompensate, and he did not have a current history of one or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (R.p. 20). Substantial evidence in the case record supports these findings, and Plaintiff has simply failed to point to evidence supportive of his assertion that he met this Listing.

Although Dr. Carlton thought Plaintiff would have mild-to-moderate difficulties in activities of living, and moderate difficulties in concentrating and persisting at a task, she did not note or predict any episodes of decompensation; (see R.p. 373); and Plaintiff has not presented any medical evidence of repeated episodes of decompensation or predictive episodes of decompensation. Plaintiff has also has not shown that he has lived in or required a "highly supporting living arrangement." Appendix A explains:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.



20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F).  Here, Plaintiff reported living at his in-laws home where he helped care for someone else, a father-in-law who had a stroke and a grandmother with Parkinson's. There is no indication that this home constituted a highly structured and supporting setting to take care of Plaintiff's mental demands.

Plaintiff also argues that he has met Listings 12.05(B) and (C)[12] because the greater weight of the evidence shows that he has "subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," IQ scores of 59 or less as required by 12.05(B), and both an IQ score of 60 through 70 and another impairment imposing additional and significant work-related limitations of function (vertigo, bilateral foot pes cavovarus, right eye strabismus, and depression) as required by 12.05(C).  The Listings at 12.05(B) and (C) require a claimant to show:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;

---

[12]Although not part of Plaintiff's argument, the ALJ also found that Plaintiff did not meet 12.05(A) because he had not shown mental incapacity evidenced by dependence on others for personal needs and inability to follow directions (such that the use of standardized measures of intellectual functioning is precluded), as evidenced by Plaintiff's acknowledged ability to take care of his personal hygiene without assistance from others.  (R.p. 20).  Additionally, the ALJ found that Plaintiff did not meet 12.05(D) because he did not have  at least two of the paragraph D criteria of marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation each of extended duration because he had only mild to moderate limitations in the first three areas and no repeated episodes of decompensation.  (R.p. 19).



> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Although Dr. Carlton reported that testing indicated that Plaintiff had a full scale IQ score of 57 , the ALJ found that Plaintiff did not meet Listings 12.05(B) or 12.05(C) because this score was not consistent with Plaintiff's past relevant semi-skilled work (R.p. 70), his ability to have a current, valid driver's license, his capability to do some reading and writing as evidenced by his ability to complete the function report, his report that he enjoyed reading the Bible, and that he left school because he was suspended for fighting and elected not to return, not because of academic issues. (R.p. 20).  The ALJ also found that Plaintiff did not have a valid IQ score as to Listing 12.05(C), for the same reasons as he found in regard to Listing 12.05(B), and because Plaintiff acknowledged in his function report that he does grocery shopping and can count change.  (Id.). Although Plaintiff disagrees with the ALJ's finding, the ALJ's questioning of the validity of Plaintiff's IQ scores was proper and within his authority as the fact-finder based on Plaintiff's level of functioning and the finding of the state agency psychological consultants that Plaintiff was more likely in the borderline intellectual range of functioning (R.pp. 103, 135). See Hancock v. Astrue, 667 F.3d 470, 476 (4th Cir. 2012) ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."); Rowland v. Colvin, 2015 WL 2238958, at *7 (W.D.Va. May 12, 2015); see also Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].



Further, even if Plaintiff *could* show the required valid IQ score, he has not shown the required deficits in adaptive functioning required by Listings 12.05B and 12.05C, which require a claimant to meet the introductory paragraph threshold by showing "significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 12.00(A). See Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria."]. Plaintiff has the burden of proving an adaptive deficiency during the developmental years; see Hancock v. Astrue, 667 F.3d at 476 ; see also Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)[claimant has the burden of production and proof at Steps 1 to 4 of the sequential evaluation process]; and he failed to do so.

Deficits in adaptive functioning "include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012)(citing Atkins v. Virginia, 536 U.S. 304, 308 n. 3 (2002)). The ALJ noted numerous facts demonstrative of Plaintiff's adaptive functioning including that Plaintiff could perform simple math (R.p. 26), could read and write as evidenced by the function report he completed (R.pp. 20, 26, 296-303), had a driver's license and drove (R.pp. 20, 26, 47, 63, 303, 367, 370), went grocery shopping (R.p. 20, 26, 370), and reported in his function report that he could count change and read the Bible (R.p. 20, 26, 299-300). He also noted that Plaintiff's past relevant work included one semi-skilled occupation (R.p. 20, 26, 70). See Richardson v. Social Security Admin. Comm'r., No. 10-313, 2011 WL 3273140 at * 7 (D.Me. July 29, 2011)["In recognition of the fact that an administrative record will not always allow for meaningful assessment of a claimant's adaptive



functioning in childhood (other than through claimant's testimony), courts have generally allowed administrative law judges to draw inferences about childhood functioning based on evidence related to functioning in adulthood.")(citing <u>Monroe v. Astrue</u>, 726 F.Supp.2d 1349, 1355 (N.D.Fla. 2010)["If a claimant has been able to adapt in functioning after age 22, it is permissible to find that Listing 12.05C has not been met."].[13]

       Plaintiff may be arguing that his educational history shows deficits in adaptive functioning because he attended special education classes and did not graduate from high school. However, Plaintiff's educational records indicate that Plaintiff received mostly As and Bs in his elementary school  EMH classes, including reading, language, spelling, and writing.  (R.p. 249). Although he had a few grades in the 70 range in secondary school, most of his secondary grades were in the 80s and 90s in CE classes.  (R.p. 259).  Additionally, as noted by the ALJ, Plaintiff dropped out of school after he was suspended from school for fighting in January 1985, not for academic reasons.  (R.pp. 20, 27, 257-258).  Furthermore, Plaintiff was able to complete an Adult Function Report, in which he noted that he was the person who completed the form (which required him to read and respond to a number of questions).  (R.pp. 290-303).

       There is also no evidence that Plaintiff had problems taking care of himself, communicating, or getting along with others.  Plaintiff reported to Dr. Carlton that he had no

---

[13]A reviewing court may consider fact-finding displayed throughout the ALJ's decision in considering whether substantial evidence supports the ALJ's step three determination.  <u>See</u>, <u>e.g.</u>, <u>Smith v. Astrue</u>, 457 F. App'x 326, 328 (4th Cir. 2011), citing <u>Fisher-Ross v. Barnhart</u>, 431 F.3d 729, 733-734 (10th Cir. 2011); <u>McCartney v. Apfel</u>, 28 F. App'x 277, 279 (4th Cir. 2002); <u>Kiernan v. Astrue</u>, 2013 WL 2323125, at *5 (E.D.Va. May 28, 2013)[an ALJ "need not use any particular 'magic' words or follow a 'particular format'.... Where the ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion in his Step 3 analysis")(citing <u>Smith v. Astrue</u>, 457 F. App'x at 328; <u>Fisher-Ross</u>, 431 F.3d at 733-734; <u>McCartney</u>, 28 F. App'x at 279).



difficulty independently caring for his personal hygiene, had no difficulties getting along with supervisors or coworkers on the job, got along well with his family, and got along pretty well in general with people, while in his function report Plaintiff stated he spent time with others in fellowship at church twice a week and got along well with authority figures. (R.pp. 24, 300, 302, 369). Further, although one-time examiner Dr. Carlton opined that Plaintiff would not be considered capable of handling any funds (R.p. 373), his treating family physician (Dr. Bernardo) found that Plaintiff was capable of handling monthly benefits in his own best interest. (R.p. 365). Cf. Jenkins v. Astrue, No 0:09-1653-JFA-PJG, 2010 WL 3168269, at *5 (D.S.C. Mar. 22, 2010)[Concluding that ALJ's finding that Plaintiff did not show the required deficits in adaptive functioning, despite her low IQ score at age fourteen, was supported by substantial evidence including his observations that Plaintiff married, was raising children, that there was a lack of evidence of difficulty or ability to function in the workplace or at home, that there was no indication in the treatment notes of difficulty with making reasoned and informed medical or personal decisions, and that no representative payee was sought]; cf. Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004)[Rejecting a Listing 12.05(C) claim where the claimant "did not display the significant limitations in adaptive functioning that 12.05 requires"].

Additionally, the ALJ's determination that Plaintiff did not meet or equal Listing 12.05 is also supported by the findings of the state agency psychologists who considered Plaintiff's mental impairments and found that his IQ scores were not valid, that he was most likely functioning in the borderline intellectual functioning (BIF) range, and that he did not have deficits in adaptive functioning (R.pp. 88, 135). See Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [opinion of a non-examining physicians can constitute substantial evidence to support the decision of the



Commissioner]; SSR 96-6p [Agency physicians are experts in the evaluation of medical issues for purposes of disability claims]; see also Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessments of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]; Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations].

       The ALJ's decision sets forth his reasoning for why Plaintiff did not meet or equal Listings 12.02 and/or 12.05 and the evidence and records cited by the ALJ provide substantial evidence to support his conclusions. Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]. Therefore, this claim is without merit. Sullivan v. Zebley, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."]; see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)["[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss"]; Carter v. Astrue, No. 08-37, 2009 WL 2750987 at * 2 (M.D.Ga. Aug. 26, 2009).

### Combination of Impairments

       Plaintiff also briefly references in his brief that the ALJ failed to consider the combined effects of his impairments. See Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989)[Holding that disability may result from a number of impairments which, taken separately, might not be disabling, but whose combined effect, taken together, is sufficient to render a claimant unable to engage in substantial activity]. Specifically, he argues that the ALJ failed to consider the combined effect of his physical impairments, mental impairments, and pain (including his vertigo, chronic pain,



cognitive deficits, anxiety, and depression) which he claims prevented him from performing any type of work, even at the sedentary level.

However, a review of the decision shows that the ALJ properly considered the combined effect of Plaintiff's severe and non-severe impairments in considering Plaintiff's impairments at each step of the sequential evaluation process. At step two, the ALJ discussed Plaintiff's severe and nonsevere impairments (R.pp. 18-19), and at step three he specifically stated that he had considered Plaintiff's impairments both singly and in combination and found that Plaintiff did not have an impairment or *combination* of impairments that met or medically equaled a listed impairment (R.p. 19). See Flaherty v. Astrue, 515 F.3d 1067, 1071 (10th Cir. 2007)[ALJ should be taken at this word when he states that he considered all of the claimant's impairments in combination]. The ALJ also noted that he had carefully considered the entire record, and he discussed both Plaintiff's severe and non-severe impairments in his RFC analysis. (R.pp. 20-28). See Wright v. Astrue, No. 2:10-2449-DCN-BHH, 2011 WL 5403104, at *7-8 (D.S.C. Oct. 18, 2011)[affirming ALJ's decision where he stated he considered the claimant's combination of impairments and discussed each impairment at some point in the decision, and where he did not offer any reason to conclude that further consideration would have produced a different result], adopted, 2011 WL 5403070 (D.S.C. Nov. 8, 2011); Miller v. Astrue, No. 08-62, 2009 WL 2762350 at * * 13-14 (E.D.Mo. Aug. 28, 2009)["Where an ALJ separately discusses the claimant's impairments and complaints of pain, as well as her level of activity, it cannot be reasonably said that the ALJ failed to consider the claimant's impairments in combination"]. Finally, the ALJ discussed Plaintiff's impairments and limitations imposed by the combination of his impairments in his hypothetical

25



question to the VE.  (R.pp. 70-72).  Therefore, Plaintiff has failed to show that the ALJ did not properly consider his combination of impairments.

### Credibility/Alleged Mischaracterization and Misstatement of Records

Finally, Plaintiff alleges that the ALJ failed to make a proper credibility determination and failed to comply with SSR 96-7p and 20 C.F.R. § 404.1529 in evaluating his subjective complaints.  Plaintiff further contends that in doing so the ALJ mischaracterized and misstated the record by finding that his limited activities supported a finding that he could work.[14]

A review of the decision shows that the ALJ specifically set out the two-step process for evaluating credibility (R.p. 21), and discussed Plaintiff's testimony and the medical record in addressing both the objective and subjective evidence.  (see R.pp. 21-28).  The ALJ concluded that Plaintiff did have medically determinable impairments that could reasonably be expected to cause the symptoms he alleged, but found that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible for the reasons explained in his decision.

---

[14]Plaintiff also argues that he is disabled based upon Rule 201.00(h) of the Medical-Vocational Guidelines which provides:

> The term younger individual is used to denote an individual age 18 through 49. For individuals who are age 45–49, age is a less advantageous factor for making an adjustment to other work than for those who are age 18–44. Accordingly, a finding of "disabled" is warranted for individuals age 45–49 who:
>> (i) Are restricted to sedentary work,
>> (ii) Are unskilled or have no transferable skills,
>> (iii) Have no past relevant work or can no longer perform past relevant work, and
>> (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h).  However, as discussed above,  the ALJ found that Plaintiff could perform a reduced range of light (not sedentary) work.  Further, even if Plaintiff was restricted to sedentary work, he has presented no evidence that he was unable to communicate in English or was unable to read and write in English (and this is countered by his testimony at the hearing and his ability to complete his function report).



(R.pp. 28).  This is the proper analytical framework for the ALJ to have followed.  See SSR 96–7p, 1996 WL 374186, at *2 [Where a claimant seeks to rely on subjective evidence to prove the severity of her symptoms, the ALJ "must make a finding on the credibility of the individual's statements, based on a consideration of the entire case record."];  Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence].

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible because they were inconsistent with his activities, including holding a valid drivers's license, driving, reading and writing as evidenced by the Function Report Plaintiff had completed, reading the Bible, going grocery shopping, going out alone, feeding and watering his dogs, caring for his personal hygiene without assistance, counting change, attending church services, walking half a mile, spending time outside with his children, playing with his children during the day, caring for his ailing relatives, caring for and feeding chickens, taking his children to the store with him, acknowledging that he could sweep and vacuum for a couple of hours, and acknowledging that he could handle the cooking. (R.p. 28).  See Johnson v. Barnhart, 434 F.3d at 658 [Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; Mastro v. Apfel, 270 F.3d at 178.

The ALJ also properly considered inconsistencies between Plaintiff's testimony and other evidence of record in evaluating the credibility of Plaintiff's subjective complaints.  See Hunter v. Sullivan, 993 F.2d 31 at 35 [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective

27



complaints]. The ALJ noted that Plaintiff's complaints were inconsistent with Dr. Pusey's physical examination and mental status examination findings (R.pp. 22, 334); Dr. Bernardo's physical examination findings (R.pp. 23, 349, 362-363); medical records indicating that Plaintiff's dizziness improved with medication (R.pp. 23, 348); Dr. Hunt's physical examination findings and functional capacity evaluation (R.pp. 23, 356-358); Dr. Carlton's GAF score of 55 (R.pp. 25, 373); the physical examination findings from Family Healthcare of Newberry (R.pp. 26, 424, 427, 432, 435); and the opinions of the state agency physicians and psychologists who opined that Plaintiff's impairments did not preclude him from working (R.pp. 88-93, 119-125). The ALJ also noted that Plaintiff was able to work at heavy and medium occupations in the past despite his congenital high arches and hammer toes (pes cavovarus). (R.p. 27).

        Plaintiff asserts that the ALJ misconstrued and mischaracterized the evidence, arguing that just because he was able to keep himself clean, feed himself, attend church, and listen to the Bible on tape did not mean that he was able to work. However, the ALJ noted Plaintiff's testimony as to his limitations, contrasting that testimony with Plaintiff's reports to Dr. Carlton and his function report showing he engaged in a greater degree of activity than was indicated by his testimony (R.p. 28), as well as contrasting that testimony with the objective medical evidence in the record (R.pp. 22-28). Johnson v. Barnhart, 434 F.3d at 658 [Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Lee v. Sullivan, 945 F.2d 687, 692 (4th Cir. 1991)[ALJ not required to include limitations or restrictions in his decision that he finds are not supported by the record].



After a review of the record and evidence in this case, the court can find no reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff. See 20 C.F.R. § 404.1529(c) [ALJ must consider objective medical evidence]; Parris v. Heckler, 733 F.2d 324, 327 (4th Cir. 1984) ["[S]ubjective evidence . . . cannot take precedence over objective medical evidence or the lack thereof." (citation omitted)]. Therefore, this argument is without merit.

### Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

February 25, 2016
Charleston, South Carolina



### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).